UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | | |
|---|---|---|
| RONNIE G. RUTLEDGE, | ) | 1:05-CV-00972 AWI GSA HC |
| Petitioner, | ) | |
| | ) | FINDINGS AND RECOMMENDATION REGARDING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ) | |
| | ) | |
| D. ADAMS, Warden, | ) | |
| Respondent. | ) | |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Superior Court of California, County of Kern, following his conviction on April 9, 2003, by jury trial of one count of corporal injury of a cohabitant (Cal. Penal Code § 273.5(a)), one count of assault with intent to commit rape (Cal. Penal Code §§ 220, 261(a)(2)), one count of criminal threats (Cal. Penal Code § 422), and one count of aggravated false imprisonment (Cal. Penal Code §§ 236, 237(a)). See LD-1[1]; Petition, Exhibit A. The jury also found true the allegation

---

[1] "LD" refers to the documents lodged by Respondent with his answer.

1  that Petitioner had personally used a deadly weapon during the commission of the offense. (CT[2] 237-
2  243.) Petitioner admitted he had been previously convicted of a felony within the meaning of
3  California's Three Strikes law. (CT 147-148.) Petitioner was sentenced to serve a total determinate
4  term of nine years. Id.

5       Petitioner filed a notice of appeal to the California Court of Appeals, Fifth Appellate District
6  (hereinafter "Fifth DCA"). On December 9, 2004, the Fifth DCA modified the judgment to strike the
7  $40 surcharge but affirmed in all other respects. Id. Petitioner then filed a petition for review in the
8  California Supreme Court. See Petition, Exhibit B. The California Supreme Court denied the petition
9  on February 23, 2005, stating: "Petition for review denied without prejudice to any relief to which
10  defendant might be entitled after this court determines in *People v. Black,* S126182, and *People v.*
11  *Towne,* S125677, the effect of *Blakely v. Washington* (2004) ___ U.S. ___ 124 S.Ct. 2531, on
12  California law." See LD-7.

13       On July 28, 2005, Petitioner filed the instant federal petition for writ of habeas corpus in this
14  Court. Petitioner presents the following ground for relief: "Unlawful sentence (Blakely v.
15  Washington) error in violation of 8th and 14th Amendments U.S. Constitution." On January 23, 2006,
16  Respondent filed an answer to the petition. Petitioner did not file a traverse to the answer.

17                               **FACTUAL BACKGROUND**[3]

18       Petitioner and K. lived together with their children. K.'s cousin, Arlene, and her boyfriend,
19  Philip, lived next door.

20       One evening, Arlene saw Petitioner and several of his relatives at Petitioner's house drinking.
21  Petitioner was "obnoxiously drunk" and trying to start fights with everyone. Arlene could hear things
22  being thrown, and her children could not sleep due to the noise. Philip and another neighbor went
23  next door to try to calm Petitioner down, but they were almost drawn into a fight. Arlene eventually
24  called K., who was spending the night at a girlfriend's house, and complained to K. that Petitioner
25  and his guests were "really loud and rowdy." When K. returned home between 3:30 and 4:00 a.m.,

---

[2] "CT" refers to the Clerk's Transcript on Appeal.

[3] The facts are derived from the factual summary set forth by the Fifth DCA in its opinion of December 9, 2004, and are presumed correct. 28 U.S.C. §§ 2254(d)(2), (e)(1). See Petition, Exhibit A.

Arlene complained to her about what had been going on at the house. At that time, Arlene saw no injuries on K.'s face. From her window, Arlene could see the people next door fighting, and K. was "in the middle of it." Arlene saw nobody hit K., and K.'s face was not injured at that point. At about 5:00 a.m., Arlene tried to go to sleep. She was able to block out some of the noise by turning on the cooler.

Several hours later, Arlene woke to hear K. screaming and pounding on her door. K. was covered in blood and dressed in only a T-shirt. K. told Arlene that Petitioner had a knife and was trying to kill her. She also said Petitioner had thrown her on the bed, ripped off her clothing and tried to have sex with her. While Petitioner was on top of K., he had his hands on her throat and tried to choke her. K. told Arlene that Petitioner was unable to have an erection and he began biting her in her "private area." K. asked for some shorts because she was without any pants or underwear. K. told Arlene that Petitioner hit her over and over and threw her into the closet.

Arlene considered contacting K.'s mother, but knew she would be at church. Instead, she left to find her own mother. When she returned, K. was back at her own house, as were Petitioner's relatives. When Arlene saw K., she was on the phone with the 911 operator. Arlene was present when K. spoke to the police officer. K. later told Arlene that she did not want to testify against Petitioner and that she still loved him.

Officer Matthew Calvillo testified that he and Officer Charlie Calwell responded to a dispatch about 8:30 a.m. and found K. sitting in her dining room. She was crying and nervous and had visible injuries to her face. K. spoke to the officers freely, and in the presence of two other females. She told officers that she and Petitioner argued because he accused her of cheating on him with another individual who had been at the party. Petitioner struck K. on the left side of her face with his fist, grabbed her by the hair and threw her into the closet. When he opened the closet door, he told K. he would kill her if she screamed. He then struck K. on the bridge of her nose, threw her on the bed and ripped off her clothing. He attempted to have sexual intercourse with K. but was unable to attain an erection. He then went to the kitchen and returned with a knife. He got on top of K., attempted to choke her, and threatened to kill both her and himself. When Petitioner went back into the kitchen, K. escaped and fled next door. K. showed the officers the closet in the bedroom.

1  There were blood streaks inside it.

2      Officer Calvillo spoke to K. a second time in the hospital. At that point, she was alone. K.
3  "reiterated everything she had told me prior" and also stated that Petitioner attempted to duct tape
4  her mouth shut to keep her quiet while she was in the closet. When K. told Petitioner she could not
5  breath because blood was rushing down her face, he forced her back into the closet and told her to be
6  quiet. K. told the officer she believed Petitioner when he said he would kill her.

7      A week after the incident, Officer Calvillo received a telephone call from K. asking if
8  Petitioner had been arrested yet. She stated she was in the process of moving out of the residence and
9  was afraid of Petitioner.

10     Dr. Albert DeLaGarza treated K. at the hospital after the incident. K. had "obviously been
11 beaten." Her left eye was swollen almost shut. K. told the doctor that she had been physically
12 assaulted by her boyfriend, with his fists, and that he had attempted to choke her and sexually assault
13 her. He did not complete the sexual assault because, according to K., he had been unable to attain an
14 erection.

15     At Petitioner's preliminary hearing, K. described his attack on her in terms to those she had
16 earlier reported to Arlene, the officers and the physician who treated her. Later, at trial, K.'s story
17 changed. She testified that, when she returned to the house, she got a beer and began visiting with
18 those present. While they were visiting, they began to argue and it "kind of turned worse and worse."
19 At one point, K. went next door to pacify Arlene because the party was so loud.

20     When K. returned, everyone was outside in the front of the house fighting. Petitioner was
21 fighting with his cousin. K. joined in the fight, but Petitioner told her to get into the house. She went
22 into her bedroom and Petitioner followed. Petitioner told her "they were coming back" and pushed
23 her into the closet. Once inside the closet, K. noticed she was bleeding from her face, but she did not
24 know who had injured her. Later, Petitioner opened the closet door, grabbed her arm and pulled her
25 out. K. ended up on the bed. Petitioner noticed K. was bleeding and left the room, yelling and
26 cussing that he was going to kill whoever did this to her. When Petitioner returned, he was "still
27 pretty out of it" and had a steak knife in his hand.

28     K. stated that, when she no longer heard noise outside, she went to Arlene's. K. did recall

speaking to police officers that morning and also having her picture taken by the police. K. was shown the photographs at trial, but she did not know who was responsible for the injury to her left eye. She "might have" told the officers that Petitioner had caused the injury, but she did not think she told the officers that it was because Petitioner believed she was cheating on him with one of his relatives.

K. denied that Petitioner threatened to kill her, that he ever pointed the knife at her, that he ever threatened her with the knife, or that he struck her on the face or hit her on her nose. K. also denied that Petitioner attempted to have sexual intercourse with her. K. claimed she did not call police and did not call 911, but later stated she spoke to the operator although she did not initiate the call. K. disagreed that Petitioner was upset with her because he thought she was "messing around" with one of his cousins. K. further denied seeing Petitioner with duct tape and that he attempted to put such tape over her mouth while she was in the closet.

K. did not remember telling the officers that Petitioner had become upset with her and struck her with his fist numerous times on the left side of the face. She also did not remember saying that Petitioner grabbed her hair.

She denied telling the officers that Petitioner threw her on the bed and ripped off her clothes. She claimed her clothes were removed because she and Petitioner were going to have intercourse. One of Petitioner's cousins walked in on them and interrupted them. K. stated that she "[p]robably" told the officer Petitioner was unsuccessful in obtaining an erection, "but that's not what happened."

When K. spoke to the 911 operator, she stated she needed an officer to come to her residence because she had been hit. She testified she did tell the operator that Petitioner beat her up and held her hostage. She did not remember telling the operator that Petitioner had threatened to kill her. She claimed she did not tell or did not remember telling the operator that Petitioner had ripped off her clothing.

The 911 tape was played for the jury. K. claimed that she was "being coerced by everybody around" her to say what she did on the tape.

After officers arrived at her home and spoke to her, K. was taken to the hospital. She claimed not to remember talking to a doctor about her injuries. She received stitches over her left eye.

K. was asked about her testimony at the preliminary hearing. She did not remember what she was asked at the hearing. Reading over a copy of the transcript did not refresh her memory. She stated that she was not truthful if she said Petitioner hit her in her eye with his fist.

K. acknowledged having contact with Petitioner since the incident, and that she had spoken about this case with him "[s]ometimes. Not really. Indirectly maybe." K. stated she was still in love with Petitioner.

**DISCUSSION**

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 fn.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Kern County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir.1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II. Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70

(2003).  Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1).  In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly.  Rather, that application must also be unreasonable." Id. at 411.  A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or

1 involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle,
2 94 F.3d 1321, 1325 (9th Cir. 1996).  Although only Supreme Court law is binding on the states,
3 Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court
4 decision is objectively unreasonable.  See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th
5 Cir.1999).

6       AEDPA requires that we give considerable deference to state court decisions. The state
7 court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's
8 interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir.2002), *cert. denied*, 537
9 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

10 **III.  Review of Petition**

11       In his sole ground for relief, Petitioner alleges the trial court violated his constitutional rights
12 under the Eighth and Fourteenth Amendments as set forth in Blakely v. Washington, 542 U.S. 296
13 (2004) when the court sentenced Petitioner to consecutive terms based on findings of fact not
14 determined by the jury.

15       A.  Exhaustion

16       A petitioner who is in state custody and wishes to collaterally challenge his conviction by a
17 petition for writ of habeas corpus must exhaust state judicial remedies.  28 U.S.C. § 2254(b)(1).  A
18 petitioner can satisfy the exhaustion requirement by providing the highest state court with a full and
19 fair opportunity to consider each claim before presenting it to the federal court. Duncan v. Henry,
20 513 U.S. 364, 365 (1995); Picard v. Connor, 404 U.S. 270, 276 (1971); Johnson v. Zenon, 88 F.3d
21 828, 829 (9th Cir. 1996).  A federal court will find that the highest state court was given a full and
22 fair opportunity to hear a claim if the petitioner has presented the highest state court with the claim's
23 factual and legal basis. Duncan, 513 U.S. at 365 (legal basis); Kenney v. Tamayo-Reyes, 504 U.S. 1,
24 112 S.Ct. 1715, 1719 (1992) (factual basis).

25       Respondent correctly argues that Petitioner's claim, to the extent it is based on a violation of
26 his Eighth Amendment rights, is unexhausted.  Petitioner presented his challenge to the trial court's
27 imposition of consecutive sentences on direct appeal and in the petition for review, however, he did
28 so in the context of his rights under the Sixth Amendment, not the Eighth Amendment. Therefore,

his claimed violation of his Eighth Amendment rights is unexhausted and must be dismissed.

### B. Sentencing Background

As set forth above, Petitioner was convicted of four counts: Count 1 - corporal injury of a cohabitant; Count 2 - assault with intent to commit rape; Count 3 - criminal threats; and Count 4 - aggravated false imprisonment. The jury also found true the allegation that Petitioner had used a deadly weapon during the offense. Further, Petitioner admitted he had been previously convicted of a felony within the meaning of California's Three Strikes law.

As a result, Petitioner was sentenced as follows: Count 2 was selected as the base term and Petitioner was sentenced to 2 years, doubled to 4 under the Three Strikes law; Count 1 was made consecutive to Count 2 and the court sentenced Petitioner to one-third of the doubled middle term of 6 years, or 2 years; Count 3 was made consecutive to Count 1 and Petitioner was sentenced to one-third the 4-year doubled middle term, or sixteen months, plus four months for the weapons-use enhancement; and Count 4 was made consecutive to Count 3 and Petitioner was sentenced to one-third to 4-year doubled middle term, or sixteen months. (CT 258.) The total of the sentence was 9 years.

The trial court made the following remarks in determining that a consecutive sentence was warranted:

> This is a unique set of circumstances in that . . . the beating was delivered by [Petitioner], then the victim was closeted for a period of time, and then she was taken out and he attempted intercourse. And then he went and got the knife and threatened her . . . [I]n each case there was time for him to reflect between act one, act two, act three to act four. And, consequently, consecutive sentences are appropriate. ¶ The crimes and their objectives were predominantly independent of each other. And they involved separate acts of violence or threats of violence.

See Petition, Exhibit A at 11.

### C. Review of Claim by State Courts

The claim was first presented on direct appeal to the Fifth DCA. On December 9, 2004, the Fifth DCA denied the claim in a reasoned opinion. See Petition, Exhibit A at 11-12. Petitioner then filed a petition for review in the California Supreme Court. See Petition, Exhibit B. The petition was denied on February 23, 2005. See LD-7. The California Supreme Court, by its "silent order" denying review of the Fifth DCA's decision, is presumed to have denied the claims presented for the same

reasons stated in the opinion of the Fifth DCA.  <u>Ylst v. Nunnemaker</u>, 501 U.S. 797, 803 (1991).

The appellate court analyzed and rejected the claim as follows:

> [Petitioner] contends his consecutive sentence must be reversed for error under *Blakely v. Washington, supra,* __ U.S. __ [124 S.Ct. 2531]. We disagree for the reasons stated in *People v. Picado* (2004) 123 Cal.App.4th 1216, 1244-1245. (See also *People v. Vaughn* (2004) 122 Cal.App.4th 1363, 1370-1372.) Certainly, we agree that judicial factfinding does occur in connection with a trial court's exercise of discretion in sentencing concurrently or consecutively. We believe, however, that the concern addressed in *Blakely*, and in *Apprendi v. New Jersey* (2000) 530 U.S. 466, is not judicial factfinding in connection with the exercise of sentencing discretion, but instead, the erosion of the right to trial *of crimes* by jury, about which Justice Scalia commented in his dissenting opinion in *Monge v. California* (1998) 524 U.S. 721, 737-741. We do not find that concern to be implicated in consecutive sentencing.

<u>See</u> Petition, Exhibit A at 11-12.

### D.  Review of Claim

The state court determination was not contrary to, or an unreasonable application of, Federal law as determined by the Supreme Court. 28 U.S.C. § 2254(d). In <u>Apprendi v. New Jersey</u>, 530 U.S. 466, 490 (2000), the Supreme Court found that, "[o]ther than a prior conviction, any fact that increases the penalty for a crime beyond the statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Supreme Court reaffirmed this holding in <u>Blakely v. Washington</u>, 542 U. S. 296 (2004). However, neither <u>Apprendi</u> nor its progeny stand for the proposition that a judge may not determine whether to impose consecutive sentences for convictions of multiple crimes, and Petitioner has not cited any United States Supreme Court holding that consecutive sentences violate a defendant's Sixth Amendment rights. See <u>Hassinger v. Adams</u>, 243 Fed. Appx. 286, 288 (9th Cir.2007) ("Hassinger's claim that the trial court erred in imposing his sentences consecutively rather than concurrently does not implicate the constitutional rights involved in Blakely" ), *cert. denied*, 128 S.Ct. 209 (2008); <u>Esmay v. Runnels</u>, 2007 WL 3105072 (N.D.Cal.2007). Therefore, the claim must be denied.  <u>Carey v. Musladin</u>, 549 U.S. 70, 127 S.Ct. 649, 654 (2006).

### RECOMMENDATION

Accordingly, the Court RECOMMENDS that the petition for writ of habeas corpus be DENIED. It is FURTHER RECOMMENDED that the Clerk of Court be DIRECTED to enter judgment for Respondent.

1    This Findings and Recommendation is submitted to the Honorable Anthony W. Ishii, United
2 States District Court Judge, pursuant to the provisions of 28 U.S.C. § 636(b)(1)(B) and Rule 72-304
3 of the Local Rules of Practice for the United States District Court, Eastern District of California.
4 Within thirty (30) days (plus three days if served by mail) after being served with a copy, any party
5 may file written objections with the court and serve a copy on all parties.  Such a document should
6 be captioned "Objections to Magistrate Judge's Findings and Recommendation."  Replies to the
7 objections shall be served and filed within ten (10) <u>court</u> days (plus three days if served by mail)
8 after service of the objections.  The Court will then review the Magistrate Judge's ruling pursuant to
9 28 U.S.C. § 636(b)(1)(C).  The parties are advised that failure to file objections within the specified
10 time may waive the right to appeal the District Court's order.  <u>Martinez v. Ylst</u>, 951 F.2d 1153 (9th
11 Cir. 1991).

13    IT IS SO ORDERED.

14    **Dated:   May 30, 2008**                    **/s/ Gary S. Austin**
                                                UNITED STATES MAGISTRATE JUDGE